IN THE UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

BARRY GREEN, as Personal Representative
of the Wrongful Death Estate of
JOSHUA MAESTAS; and CAROLINA MAESTAS,

    Plaintiffs,

v.     Case No. 1:22-cv-00609-KK-JHR

4E GLOBAL S.A.P.I. de C.V.; and
WAL-MART STORES EAST, LP,

    Defendants.

## AMENDED COMPLAINT FOR STRICT PRODUCT LIABILITY, NEGLIGENCE, AND LOSS OF CONSORTIUM

COMES NOW Plaintiffs, Barry Green, as the Personal Representative of the Wrongful Death Estate of Joshua Maestas, and Carolina Maestas, by and through their attorneys, DeLara | Supik | Odegard P.C., and for their Amended Complaint for Strict Product Liability, Negligence, and Loss of Consortium, state and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Barry Green brings this lawsuit in his capacity as personal representative of the wrongful death estate of Joshua Maestas, deceased. Mr. Green was appointed the Personal Representative for purposes of the Wrongful Death Act on September 7, 2021 in Cause No. D-202-CV-2021-04869 and is a resident of Santa Fe County, State of New Mexico.

2. Carolina Maestas is a resident of Bernalillo County, New Mexico.

3. 4E Global S.A.P.I. de C.V. (hereinafter "4E Global") is a Mexican company with its principal place of business located at Av. Uno Norte No. 15 Int. 1F, 1E Y 1G Tultitlán Tultitlán de Mariano Escobedo, ESTADO DE MEXICO, 54918 Mexico.

4. Upon information and belief, 4E Global manufactured, distributed and/or otherwise was in the chain of companies that otherwise caused the subject hand sanitizer to be placed into commerce and sold in New Mexico, thereby creating the necessary contacts in law and fact subjecting them to the jurisdiction of this Court.

5. Alternatively, upon information and belief, 4E Global registered as a human drug manufacturer with the FDA, subjecting it to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §301 et seq., including but limited to: §351(a), (b), and (d); §352(a), (e), (f)(2), (j), and (ee); §355(a); as well as §331(a) and (e); and thereby subjecting it to the laws and courts of the United States and the jurisdiction of this Court.

6. Alternatively, upon information and belief, 4E Global is the alter ego of its subsidiary, 4E Brands Northamerica, LLC, for all purposes, including personal jurisdiction, because, among other things, 4E Brands directors take direction from 4E Global; the two entities share directors and officers in common; 4E Global pays salaries, expenses, or losses of the subsidiary; 4E Global finances the subsidiary; 4E Global exercises control over the subsidiary's day-to-day operations, including but not limited to quality control testing; and the two corporations have the same records, offices, officers and staff, and payrolls.

7. Defendant Wal-Mart Stores East, LP, (hereinafter "Wal-Mart") is a foreign corporation or limited partnership conducting business in New Mexico that can be served through its registered agent, Corporation Process Company, 726 E. Michigan, Suite 330, Hobbs, NM 88240.

8. Upon information and belief, Defendant Wal-Mart owned and operated Wal-Mart Supercenter #3732, located at 901 Unser Blvd. SE, Rio Rancho, NM 87124.

9.    Upon information and belief, the Defendant Wal-Mart Supercenter sold the subject hand sanitizer at Supercenter #3732.

10.   There is diversity of citizenship, and the amount in controversy exceeds the jurisdictional amount within the meaning of 28 U.S.C. §1332.  Therefore, this Court has jurisdiction over the parties and the subject matter herein.

11.   Venue is proper pursuant to 28 U.S.C § 1391 because the events giving rise to this complaint, including but not limited to the sale of the hand sanitizer and the death of Joshua Maestas, happened in this district.

## FACTUAL BACKGROUND

12.   Plaintiff realleges and incorporate all allegations contained in the above paragraphs, as if fully set forth herein.

13.   Joshua Dominic Maestas was born April 9, 1981, and had one daughter, Carolina Maestas.

14.   On or about October 3, 2020, Joshua alerted his mother Rebecca that he was not feeling well and she took him to Presbyterian Hospital at about 9:00pm.  Because of COVID protocols, she was not allowed in the Emergency Department because Joshua was conscious, however, his state of consciousness quickly changed.

15.   Joshua almost immediately started complaining of fatigue and wanting to sleep.  A physical examination noted blown pupils bilaterally that were nonreactive to light.  To get some reaction to him, the ED staff performed a sternal rub, which is where they vigorously rub his chest try to stimulate the patient to wake up.  It is a very uncomfortable feeling, to which Joshua would only groan, suggesting that his consciousness was limited.  He was hemodynamically stable at that time.

16. By 9:35pm, Joshua had a decreased respiratory rate. There was concern for illicit drug use, and he was given Narcan, but there was no significant change in his status. There was also concern he was suffering from hyperkalemia. Eventually, he was diagnosed with severe metabolic acidosis, acute kidney injury, metabolic encephalopathy, acute hypoxemic respiratory failure, and hyperkalemia.

17. In diagnosing the cause of his kidney injury, the nephrologist requested a toxic alcohol panel, which was performed on or about 5:45am on October 4, 2020, which was resulted around 4:10pm that day. Those results showed that there was no ethanol, isopropanol acetone or ethyl glycol in his system. The only toxic alcohol present was Methanol, which explained his kidney failure, acidosis, and respiratory failure.

18. Unfortunately, the damage from the Methanol was irreversible, and Joshua died of acute hypoxic brain injury from the Methanol poisoning on October 6, 2020, just before noon, after being terminally extubated.

19. Located at his place of residence was a mostly empty bottle of Blumen brand hand sanitizer. Blumen brand hand sanitizer was distributed in the United States by 4E Brands Northamerica, LLC, a wholly owned subsidiary of Defendant 4E Global.

20. The hand sanitizer was labeled as containing as its active ingredient 70% v/v [percentage by volume] ethyl alcohol, the type of alcohol used in alcoholic beverages, and which would not have been fatal in the amount that Joshua ingested.

21. Testing performed on the remaining liquid in the bottle showed that there was a trace amount of Ethanol, but the vast majority of the liquid was Methanol, comprising 425,000mg/L.

## STRICT LIABILITY – PRODUCT DEFECT/WRONGFUL DEATH

22. Plaintiff realleges and incorporate all allegations contained in the above paragraphs, as if fully set forth herein.

23. Defendants are liable for harm caused by an unreasonable risk of injury resulting from a condition of the product or from a manner of its use. Such a risk makes the product defective. This applies even though all possible care has been used by the supplier in putting the product on the market.

24. An unreasonable risk of injury is a risk which a reasonably prudent person having full knowledge of the risk would find unacceptable.

25. The liability of the Defendants is to persons whom the Defendants can reasonably expect to use the product.

26. Hand sanitizer, while it should not be ingested, is well known within the public, as well as the hand sanitizer industry, to be a source of alcohol for those suffering from addiction and is utilized to feed that addiction. There are even videos on YouTube going back years on adolescents and adults using hand sanitizer to get drunk.

27. Upon information and belief, it is known within the Defendants' industries that adolescents and adults utilize hand sanitizer to get drunk. Therefore, Defendants can reasonably expect the hand sanitizer to be ingested.

28. At the time Defendants developed, manufactured, marketed, sold, and/or otherwise placed into the stream of commerce the Blumen hand sanitizer, it was in a defective and unreasonably dangerous condition when put to a reasonably anticipated use, in that it was mislabeled as containing 70% ethyl alcohol as its only active ingredient when it in fact contained

deadly levels of methyl alcohol, not mentioned on the label. It was therefore a misbranded, adulterated and contaminated product capable of causing serious injury and death.

29. Joshua Maestas died as a result of the defective condition of the Blumen hand sanitizer when the product was designed, manufactured, marketed, sold and/or placed into the stream of commerce by Defendants, in that the hand sanitizer contained a hidden fatal poison which killed Joshua.

30. The acts or omissions of Defendants show a sufficient culpable mental state as to justify an award of punitive damages for the willful, wanton, reckless and utter indifference by Defendants resulting in injury and damage to Plaintiffs.

31. The Wrongful Death Estate therefore requests such compensatory and punitive damages under law as the trier of the facts may deem fair and just for Joshua's death. Additionally, Carolina Maestas requests such compensatory and punitive damages under law as the trier of the facts may deem fair and just arising from her loss of consortium claims for the death of her father, Joshua.

### STRICT LIABILITY – FAILURE TO WARN/WRONGFUL DEATH

32. Plaintiff realleges and incorporate all allegations contained in the above paragraphs, as if fully set forth herein.

33. At the time Defendants developed, manufactured, marketed, sold, and/or otherwise placed into the stream of commerce the Blumen hand sanitizer, it was in a defective and unreasonably dangerous condition when put to a reasonably anticipated use, without knowledge of its characteristics in that it contained an undisclosed fatal poison, methyl alcohol, and was thereby a misbranded, adulterated and contaminated product that failed to warn that ingesting methyl alcohol could be fatal.

34. Defendants must use ordinary care in formulating, making, inspecting, testing and packaging a product.

35. Defendants failed to provide adequate warning of the dangers of the product containing methyl alcohol.

36. Defendants' failure to give an adequate warning of this danger in the hand sanitizer caused or contributed to cause the death of Joshua Maestas.

37. The acts or omissions of Defendants show a sufficient culpable mental state as to justify an award of punitive damages for the willful, wanton, reckless and utter indifference by Defendants resulting in injury and damage to Plaintiffs.

38. The Wrongful Death Estate therefore requests such compensatory and punitive damages under law as the trier of the facts may deem fair and just for Joshua's death. Additionally, Carolina Maestas requests such compensatory and punitive damages under law as the trier of the facts may deem fair and just arising from her loss of consortium claims for the death of her father, Joshua.

## NEGLIGENCE/WRONGFUL DEATH

39. Plaintiff realleges and incorporates all allegations contained in the above paragraphs, as if fully set forth herein.

40. At all times relevant, Defendants had a duty to use ordinary care in the development, manufacturing, marketing, sale, and/or otherwise placement into the stream of commerce the hand sanitizer.

41. Defendants breached their duty of ordinary care by allowing the hand sanitizer to be ingested by Joshua Maestas.

42. Defendants' breach of their duty of ordinary care caused or contributed to cause the death of Joshua Maestas.

43. Alternatively, Defendants' actions and inactions constitute negligence *per se,* as there were laws in force in the United States at the time of the incident applicable to Defendants' conduct designed to protect against the type of harm caused by Defendants' conduct, and Plaintiffs are individuals the statutes were designed to protect.  These include but are not limited to Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §351(a), (b), and (d); §352(a), (e), (f)(2), (j), and (ee); §355(a); as well as §331(a) and (e).

44. Defendants' failure to comply with some or all of the aforementioned laws and statutes caused and/or contributed to Plaintiff's injuries and damages.

45. The acts or omissions of Defendants, including the violations of statute, show a sufficient culpable mental state as to justify an award of punitive damages for the willful, wanton, reckless and utter indifference by Defendants resulting in injury and damage to Plaintiffs.

46. The Wrongful Death Estate therefore requests such compensatory and punitive damages under law as the trier of the facts may deem fair and just for Joshua's death.  Additionally, Carolina Maestas requests such compensatory and punitive damages under law as the trier of the facts may deem fair and just arising from her loss of consortium claims for the death of her father, Joshua.

## LOSS OF CONSORTIUM

47. Plaintiff realleges and incorporates all allegations contained in the above paragraphs, as if fully set forth herein.

48. Carolina Maestas had a close familial relationship with her father, Joshua Maestas.

49. Defendants conduct was the actual and proximate cause of injuries suffered by Carolina Maestas, including loss of love, society, support, and companionship of her father, Joshua Maestas.

50. Defendants' actions were deliberate, willful, wanton, malicious, reckless or fraudulent thereby entitling Carolina Maestas award of punitive damages.

51. Therefore, Carolina Maestas requests such compensatory and punitive damages under law as the trier of the facts may deem fair and just arising from her loss of consortium claims for the death of her father, Joshua.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby request a jury trial on all issues raised in this complaint.

WHEREFORE, Plaintiffs pray for judgment against Defendants for compensatory damages, punitive damages, costs, pre-judgment and post-judgment interest, and for such other appropriate relief as is just and proper.

Respectfully submitted,

DELARA | SUPIK | ODEGARD P.C.

By  */s/ David C. Odegard*
Christopher J. DeLara
Christopher J. Supik
David C. Odegard
P.O. Box 91596
Albuquerque, NM 87199-1596
(505) 999-1500
chris@delaralaw.com
supik@delaralaw.com
odegard@delaralaw.com
*Attorneys for Plaintiffs*

9